682 F.2d 93
 Ulmer D. LYNCH, Reverend Thomas Lee, and Michael Davis,
individually and as citizens of the United States
and residents and voters of the 17th
Ward of the City of Chicago,
Plaintiffs-Appellees,
v.
ILLINOIS STATE BOARD OF ELECTIONS, and Jane M. Byrne,
individually and as Mayor of the City of Chicago,
and the City Clerk of the City of
Chicago, Defendants-Appellants.
 Nos. 82-1341, 82-1515.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 28, 1982.
Decided July 6, 1982.
 
 James M. Scanlon, State Board of Elections, Jerome A. Siegan, Corp. Counsel, Chicago, Ill., for defendants-appellants.
 Ivan M. Rittenberg, Rittenberg, Krichiver, Buffen & Whitcup, Chicago, Ill., for plaintiffs-appellees.
 Before BAUER, WOOD, and COFFEY, Circuit Judges.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Defendants appeal from a decision of the district court holding unconstitutional the application of Ill.Rev.Stat. ch. 24, § 3-2-7 (1980), which authorized the Mayor of the City of Chicago to fill an aldermanic vacancy by appointment. In view of the Supreme Court's recent decision in Rodriguez v. Popular Democratic Party, --- U.S. ----, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982), we reverse.
 
 I.
 
 2
 Prior to December 1, 1980, the Illinois Municipal Code authorized special elections to be held for the purpose of filing vacancies in elective municipal offices. Ill.Rev.Stat. ch. 24, § 3-2-7 (1979). Effective December 1, 1980, the Illinois General Assembly amended section 3-2-7 as part of an overall plan for the consolidation of elections in Illinois:
 
 
 3
 Except as otherwise provided in this Code, whenever a vacancy occurs in any elective municipal office, with at least 28 months remaining in a 4-year term, and the vacancy occurs at least 130 days before the next scheduled general municipal election as provided in the general election law, the office shall be filled for the remainder of the term at that general municipal election.... Until the office is filled by election, the mayor or president shall appoint a qualified person to the office, subject to the advice and consent of the corporate authorities. Municipal officers appointed or elected under this Section shall hold office until their successors are elected and have qualified.
 
 
 4
 1980 Illinois Laws, P.A. 80-1469, § 4; 1981 Illinois Laws, P.A. 81-1490, § 2. That amendment thus eliminated the use of special elections.
 
 
 5
 Section 3-2-7 must be read with reference to the new Illinois Election Code, which establishes a consolidated schedule of elections. Ill.Rev.Stat. ch. 46, § 2A-1.2 (1980). That schedule provides for all elections, with only a few exceptions, to be held on one of five regular dates over a two-year cycle. The general election and the general primary election are held in the even-numbered years. Id. § 2A-1.1(a). In the odd-numbered years, the consolidated election is held in April, the consolidated primary election in February, and the nonpartisan election in November. Id. § 2A-1.1(b), (c). The pertinent provision here, section 2A-1.2(d), requires that where, as in the City of Chicago, candidates for alderman are not permitted to be candidates of political parties, aldermanic elections shall be held on the consolidated primary election date, subject only to possible run-off elections held at the consolidated election. By eliminating the use of special elections to fill aldermanic vacancies, section 3-2-7 of the Municipal Code, in conjunction with section 2A-1.2 of the Elections Code, allows suspension of representation by ballot for up to 28 months plus 129 days.
 
 II.
 
 6
 Plaintiffs are three registered voters of the 17th Ward in the City of Chicago. Their claim arises from an appointment made by the mayor, pursuant to section 3-2-7, to fill a vacancy created on January 13, 1981 in the office of alderman for the 17th Ward. That vacancy occurred with twenty-seven months of a four-year term remaining and only one month before the next general municipal election. Under the new Illinois elections law, the mayor's appointee will hold office for twenty-five months, until the consolidated primary election in February 1983. That is, he will serve out the remainder of the term because it is less than twenty-eight months.
 
 
 7
 Plaintiffs complained that the twenty-five month suspension of their right to vote offends the Constitution of the United States. The district court agreed and ordered a special election to be held June 1, 1982 and, if necessary, a run-off election to be held June 29, 1982.
 
 III.
 
 8
 Although it is unclear what standard of review the district court applied, the opinion of the court suggests the standard of strict scrutiny.[1] Supporting the district court's analysis, plaintiffs argue that "Section 3-2-7 involves a discernible fundamental liberty-the right of direct election of the people's representative-(, and therefore) this statute must be given strict scrutiny ... and the State must show a compelling interest in the least drastic means." We find that the district court failed to give proper deference to the judgment of the Illinois legislature.
 
 
 9
 In Rodriguez, the Supreme Court upheld a Puerto Rico statute which had been interpreted to permit an interim vacancy in the Puerto Rico House of Representatives to be filled by the political party of the legislator who had vacated the seat. The statute allowed the appointee to serve until the term of his predecessor has expired-approximately forty months. The appellants had argued that they have a federal constitutional right to elect their representatives and that legislative vacancies therefore must be filled by special election.
 
 
 10
 Addressing that constitutional challenge, the Court noted that no provision of the Constitution expressly mandates the procedures a state must follow in filling vacancies in its legislature, and that "the right to vote, per se, is not a constitutionally protected right." At ----, 102 S.Ct. at 2199, quoting San Antonio School District v. Rodriguez, 411 U.S. 1, 35 n.78, 93 S.Ct. 1278, 1298 n.78, 36 L.Ed.2d 16 (1973). Moreover, the Court reiterated that the Constitution does not compel "a fixed method of choosing state or local officers or representatives." --- U.S. at ----, 102 S.Ct. at 2199. See also Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) (appointment of county school board members); Fortson v. Morris, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966) (legislature elects governor where no candidate receives majority vote in election). Provided the statute at issue does not restrict access to the electoral process or discriminate among classes of voters or political parties, the method chosen by the state legislature for filling vacancies is entitled to substantial deference.[2] --- U.S. at ----, ----, 102 S.Ct. at 2200, 2201.
 
 
 11
 The Rodriguez Court relied on its decision in Valenti v. Rockefeller, 393 U.S. 405, 89 S.Ct. 689, 21 L.Ed.2d 635 (1969), aff'g, 292 F.Supp. 851 (S.D.N.Y.1968) (three-judge district court), wherein it upheld the authority of the Governor of New York to fill a vacancy in the United States Senate by appointment. In Valenti, the appointee would have held office for over twenty-nine months because the statute at issue required Senatorial vacancy elections to be held at the November election in even-numbered years. 292 F.Supp. at 854-55. The three-judge district court discerned at least three legitimate state interests which might reasonably be furthered by that statute: to preserve local elections (held in odd-numbered years) from the "more party-oriented political currents generated by statewide or national contests"; to ease the financial burden of campaigning in an off-year; and to spare the state the expense and inconvenience of conducting a special election. Id. at 859-60. In conclusion the court viewed the Seventeenth Amendment vacancy provision[3] as granting to the state legislatures "an area of discretion." Id. at 860.
 
 
 12
 Plaintiffs attempt to distinguish Valenti as being based on the Seventeenth Amendment. The Court in Rodriguez, however, expressly adopted the rationale of Valenti :
 
 
 13
 the fact that the Seventeenth Amendment permits a State, if it chooses, to forgo a special election in favor of a temporary appointment to the United States Senate suggests that a State is not constitutionally prohibited from exercising similar latitude with regard to vacancies in its own legislature. We discern nothing in the Federal Constitution that imposes greater constraints on the Commonwealth of Puerto Rico.
 
 
 14
 The Commonwealth's choice to fill legislative vacancies by appointment rather than by a full-scale special election may have some effect on the right of its citizens to elect the members of the Puerto Rico legislature; however, the effect is minimal, and like that in Valenti, it does not fall disproportionately on any discrete group of voters, candidates, or political parties. Moreover, the interim appointment system plainly serves the legitimate purpose of ensuring that vacancies are filled promptly, without necessity of the expense and inconvenience of a special election. The Constitution does not preclude this practical and widely accepted means of addressing an infrequent problem.
 
 
 15
 --- U.S. at ----, 102 S.Ct. at 2201 (footnote citation omitted). See also Brennan v. Haines, 455 F.2d 943 (3rd Cir. 1971), cert. denied, 408 U.S. 924, 92 S.Ct. 2495, 33 L.Ed.2d 335 (1972); Kaelin v. Warden, 334 F.Supp. 602 (E.D.Pa.1971) (three-judge district court).
 
 
 16
 Rodriguez and Valenti clearly show that section 3-2-7 is not constitutionally infirm. Both decisions sustain the authority to fill vacancies in elective offices by appointment, even though the appointee will hold office for the duration of the term. Here, as in Valenti, that authority is vested in the executive. While the Court in Rodriguez suggested that appointment by the political party of the predecessor might offer better continuity of party representation than would appointment by the executive, it stressed that, "(a) bsent some clear constitutional limitation," a state is "free to structure its political system to meet its 'special concerns and political circumstances.' "[4] --- U.S. at ---- & n.12, 102 S.Ct. at 2202 & n.12. In any event, section 3-2-7 does not grant the mayor unfettered power since all appointments are subject to the advice and consent of the corporate authorities. Finally, Valenti indicates that the vacancy provision is not rendered unconstitutional by the fact that five intervening elections will take place but are by statute unavailable to fill the aldermanic vacancy, so long as legitimate interests rationally support the scheme.
 
 
 17
 Unlike the district court, we do not minimize the importance of the state and municipal interests offered in support of section 3-2-7. Section 3-2-7 is an integral part of Illinois' new consolidated election scheme, which seeks to lessen voter confusion, increase voter participation, reduce election costs,[5] and provide generally for uniformity in the conduct and administration of elections. Standardization of election dates helps eliminate surprise and confusion among potential candidates and thereby lowers some of the inherent barriers to effective ballot access. It also imposes a reasonable limit on the number of times voters may be called to the polls, and creates an opportunity for more widespread voter attention by establishing election dates which are convenient and on which the electorate will consider other important issues and fill other offices. Korte-Reinheimer v. City Council of Palos Hills, 94 Ill.App.3d 219, 226, 49 Ill.Dec. 763, 767, 418 N.E.2d 783, 787 (1st Dist. 1981). The Illinois legislature has specifically adopted the twenty-eight month cut-off in other provisions governing vacancies in public office. See, e.g., Ill.Rev.Stat. ch. 81, § 1004-7 (park district trustees); ch. 105, § 2-25 (library district trustees); ch. 122, §§ 10-10, 103-7 (school board and community college board members); ch. 139, § 96 (township officers). See also ch. 46, § 25-6(g) (state senators), cited in Rodriguez, --- U.S. at ---- n.4, 102 S.Ct. at 2198 n.4. That limitation represents a considered legislative judgment as to the amount of time remaining in a term that would justify disruption of the consolidated election schedule. See Weisberg v. Byrne, 92 Ill.App.3d 780, 784, 48 Ill.Dec. 267, 271, 416 N.E.2d 298, 302 (1st Dist. 1981) (section 3-2-7).
 
 
 18
 As the Court in Rodriguez recognized, states have a legitimate interest in ensuring that governmental processes are not disrupted by vacancies and have wide latitude in devising a method to fill those vacancies promptly. In discounting the interests underlying section 3-2-7, the district court impermissibly substituted its judgment for that of the Illinois legislature.
 
 
 19
 Reversed.
 
 
 
 [1]
 The district court shifted the burden of proof to the defendants to show that state or municipal interests in postponing an election outweigh the right to vote. The court also questioned the validity of the assumptions underlying the relevant state and municipal interests
 
 
 [2]
 The Court found that the statute presented no equal protection problems, at ---- & n.10, 102 S.Ct. at 2200 & n.10, and plaintiffs here do not challenge section 3-2-7 on that ground
 
 
 [3]
 In pertinent part the Seventeenth Amendment states:
 When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: Provided, That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.
 
 
 [4]
 The district court's criticism of the mayor's appointment as unrepresentative and motivated by her own political ambitions is misplaced
 
 
 [5]
 According to testimony at trial, the City of Chicago could save an estimated $81,000 by conducting the election in the consolidated primary election and the run-off election, if necessary, in the following consolidated election rather than conducting special elections for both. Twenty-three special elections for alderman were held in Chicago between 1971 and 1980, before the new election law went into effect. Five of those special elections required a run-off election