Wendy A. GEORGES, Rev. Thomas Streiter, Rev. Leroy Kennel, and Eugene Parvin, Plaintiffs,

v.

Clifford M. CARNEY, Jean McNamara, and William Toerpe, Defendants.

No. 82 C 4917.

United States District Court, N. D. Illinois, E. D.

Sept. 2, 1982.

As Modified Sept. 2, 1982.

470

Sidney I. Schenkier, Jayne W. Barnard, Jenner & Block, Chicago, Ill., for plaintiffs.

James M. Scanlon, Gen. Counsel, State Bd. of Elections, Roger P. Flahaven, Asst. Atty. Gen., Chicago, Ill., Thomas C. Kelleghan, Wheaton, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

Plaintiffs Wendy A. Georges, Rev. Thomas Streiter, Rev. Leroy Kennel and Eugene Parvin ("Plaintiffs"), residents and registered voters in DuPage County, Illinois, seek to preliminarily and permanently enjoin Clifford M. Carney, Jean McNamara and William Toerpe, in their capacity as members of the DuPage County Board of Election Commissioners ("Defendants")[1] from enforcing certain portions of Ill. Rev. Stat. ch. 46, §§ 1–1 *et seq.* (1981), relating to the submission of citizen-initiated advisory questions of public policy for consideration by voters, §§ 28–1 and 28–6. Plaintiffs allege that these provisions, as they pertain to the general election to be held in DuPage County on November 2, 1982, individually and cumulatively violate their first and fourteenth amendment rights under the Constitution of the United States.

Plaintiffs' first amendment challenges are two-fold. First, they claim that the 25 percent signature requirement for submission of citizen-initiated advisory questions for voter consideration in a political subdivision, § 28–6, is unduly restrictive. Second, plaintiffs challenge as a "lock-out" the statutory limit to three of the number of public questions which may appear on any one ballot, whether initiated by citizen petition or resolution of a political subdivision, whether binding or advisory. § 28–1.

Plaintiffs also contend that the challenged provisions deny them equal protection of the law as guaranteed under the fourteenth amendment. This set of constitutional claims focuses on section 28–6 as creating an impermissible classification between citizen-initiated *advisory* public questions and citizen-initiated *binding* public questions,[2] by requiring that advisory questions be endorsed by 25 percent of regis-

---

**1.** Inasmuch as the named defendants declined to participate in these proceedings beyond the filing of an answer, the Court entered, on August 23, 1982, an order pursuant to 28 U.S.C. § 2403(b) certifying to the Attorney General of Illinois that the constitutionality of a statute of the State of Illinois affecting the public interest was at issue in this action and permitting the State of Illinois to intervene if intervention was sought. Pursuant to that order, the Illinois Board of Elections sought and was granted permission to intervene in this matter.

**2.** "Advisory" questions of public policy have no binding legal effect but convey to elected officials citizens' views on special issues. Ill. Rev. Stat. ch. 26, § 28–6 (1981).

"Binding" public questions are those which are expressly provided for by constitution or statute and the adoption or rejection of which have some legal and binding effect upon the authorities of the political subdivisions in which they are submitted.

tered voters and that binding questions need varying but lesser percentages in order to reach the ballot.[3]

Additionally, plaintiffs claim that the "first-come/first-served" method provided by § 28–1 for selecting the three questions of public policy for a ballot, regardless of the source of initiation or legal effect, creates a classification in favor of resolutions adopted by a political subdivision over citizen-initiated petitions. This is because, plaintiffs say, resolutions of a political subdivision may be tendered for inclusion merely upon a majority vote of such a body whereas citizen-initiated questions require a citizen petition drive. Plaintiffs argue, therefore, that questions prepared by political subdivisions almost always will be received first and, in effect, preempt those ballot places which otherwise might be claimed by citizen-initiated questions.

For reasons set forth more fully below, the Court finds that the requirement for 25 percent signatures as a predicate for placing non-binding questions of public policy on the ballot of a political subdivision is unnecessarily restrictive and, therefore, unconstitutional. The Court, however, declines to grant plaintiffs' motion for a preliminary injunction and to direct the DuPage County Board of Elections to certify the advisory public question solicited by the plaintiffs. This is because the other challenged provisions—only three public questions on any one ballot, determined on a first-come/first-served basis—are not repugnant to the Constitution when the Illinois Election Code is considered in its entirety. Accordingly, it need not be determined what lesser percentage of signatures than 25 percent of eligible voters might preserve and make meaningful the statutorily granted right to present to the electorate advisory questions of public policy.

*Factual Background*

The DuPage County Citizens for Nuclear Arms Freeze, a voluntary organization of which the plaintiffs are members, undertook a petition drive to collect the signatures necessary to submit an advisory public question to the voters of DuPage County at the general election to be held on November 2, 1982. The question asks:

Whereas one of the greatest challenges facing the people of the earth is to prevent the occurrence of nuclear war by accident or design, shall the people of the County of DuPage endorse the call to halt the nuclear arms race and request the DuPage County Board, in addition to our municipal governments, state legislature and the U.S. Congress and Senate, to adopt an immediate, mutual, and verifiable freeze of all further testing, production and deployment of nuclear warheads, missiles, and designed delivery systems by the U.S.S.R. and the U.S. governments, followed by reductions of present nuclear weapons?

On August 16, 1982, within the statutory filing deadline, plaintiffs submitted to the DuPage Board of Elections petitions signed by approximately 8,500 persons. These persons had been solicited by extensive mailing, telephoning and door-to-door canvassing.

Despite the "successful" canvass,[4] the number of signatures falls short of the statutory prerequisite for inclusion on the ballot. Section 28–6 provides that submission of an advisory public question turns on a written petition signed by 25 percent of the registered voters in the relevant political subdivision.[5] On August 16, 1982, DuPage County had approximately 301,000 regis-

---

**3.** *See, e.g.,* Ill. Rev. Stat. ch. 120, § 643a (1981), (1000 signatures required to propose lowering the tax rate); Ill. Rev. Stat. ch. 23, § 2686 (1981) (1000 signatures required to propose the establishment of home for delinquent or neglected minors).

**4.** No recent petition drive seeking endorsement of an advisory public question in DuPage County has garnered more than 3,900 signatures.

No similar citizen effort has ever gathered the requisite percentage required for carving out a place on the ballot of a DuPage County subdivision. Defendants did not present evidence to the contrary.

**5.** Where an advisory public question is to be submitted to the voters statewide, the percentage of signatures required is reduced to ten, drawn from a pool of all registered voters in

tered voters. Accordingly plaintiffs claim they needed some 75,000 signatures in support of their petition to meet the 25 percent requirement.

Even if plaintiffs had obtained 75,000 or more signatures, their petition still would have been barred from the November 1982 ballot by section 28–1. Section 28–1, in pertinent part, provides that

> Irrespective of the method of initiation, not more than 3 public questions . . . may be submitted to referendum with respect to a political subdivision at the same election.

> If more than 3 propositions are timely initiated or certified for submission at an election with respect to a political subdivision, the first 3 validly initiated, by the filing of a petition or by the adoption of a resolution or ordinance of a political subdivision, as the case may be, shall be printed on the ballot and submitted at that election.

At the time plaintiffs filed their petition, four other public questions had already been submitted to the DuPage County Board of Elections. These questions derived, not from petitions bearing the signatures of 25 percent of the DuPage County electorate, but from resolutions passed by the DuPage County Board. One of these resolutions would permit DuPage County to issue bonds for the purpose of piping water from Lake Michigan. The other three questions, which would be binding if passed, would require a 10 percent reduction in three county funds.

### Standard of Review

[1] As a preliminary matter, we must consider the standard of scrutiny applicable to this case. The general rule is that a law, even if some inequality results from it,

"will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

■ Certain statutes, however, require that a more rigorous standard—strict scrutiny—be applied. These are laws in which the challenged provisions infringe upon the rights of a suspect class [6] or impinge on a fundamental interest.[7] Where strict scrutiny is appropriate, *i.e.,* after the plaintiff establishes that a fundamental right has been infringed, the burden shifts to the state to prove that the challenged provision promotes a compelling interest in the least restrictive manner. *See, e.g., San Antonio School District v. Rodriquez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973); *Clements v. Fashing,* —— U.S. ——, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982).

No suspect classification is involved here, but plaintiffs argue that a fundamental interest in access to the ballot box is at stake. The Supreme Court has recognized that restrictions on the ballot affect two distinct but related first amendment rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). *See also Kusper v. Pontikes,* 414 U.S. 51, 56–57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973) ("the freedom to associate with others for the common advancement of political beliefs and ideas [is a form of] orderly group activity" protected by the first and fourteenth amendments); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Citizens Party of Illinois v. Illinois*

---

the state. Plaintiffs do not challenge this provision as discriminatory. Ill. Rev. Stat. ch. 46, § 28–6 (1981).

6. *See, e.g., Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (race); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) (alienage); *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (legitimacy of birth).

7. *See, e.g., Kramer v. Union Free School Dist., No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (access to voting); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (interstate migration); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (procreation).

*State Board of Elections,* No. 82 C 4574, Slip Op. at 8 (N.D. Ill., August 6, 1982).

Ballot access cases generally fall within two categories: those involving classifications based on wealth, *see, e.g., Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (invalidating candidate filing fee provisions) and those involving statutes which discriminatorily burden new or small political parties or independent candidates at the expense of established interests. *See, e.g., Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *Williams v. Rhodes, supra* (considering statutes requiring independent candidates or minority parties to demonstrate a certain level of voter support in order to secure a place on the ballot).

The first line of cases, the wealth restrictions, holds that strict scrutiny is required where a "system [of ballot access] falls with unequal weight on voters, as well as candidates, according to their economic status." *Bullock v. Carter, supra,* 405 U.S. at 144, 92 S.Ct. at 856. It is the Court's position that economic status is not a measure of a prospective candidate's qualifications for elective office nor of his serious intentions as a candidate. *Clements v. Fashing, supra,* 102 S.Ct. at 2844.

In the second, level of support, line of cases, the Court has struck down as violative of the first amendment right of freedom of association, those restrictions which make it virtually impossible for independent candidates or minority parties to achieve a ballot position. *See, e.g., Williams v. Rhodes, supra* (15% signature requirement to endorse independent candidate unconstitutional); *Illinois State Board of Elections v. Socialist Workers Party, supra* (provision requiring third party and independent candidate seeking political subdivision office to be endorsed by 5% of voters unconstitutional where it required a greater number of signatures in Cook County than required statewide).

■ Both lines of case underscore another, more basic, proposition: the state has both the right and the duty to regulate the electoral process in order to prevent chaos. Indeed, "the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, . . . the time, place, and manner of holding primary and general elections, the registration and qualification of voters, and the selection and qualification of candidates." *Storer v. Brown, supra.* See also *Kusper v. Pontikes, supra.*

■ The restrictions permitted on the electoral process are not unlimited, however: They must serve some important or, compelling state interest. Among those important interests which the Court has recognized in restricting access to the ballot are

(1) "[p]rotect[ing] the integrity of . . . political processes from frivolous or fraudulent candidacies," *Bullock v. Carter, supra,* [405 U.S.] at 145 [92 S.Ct. at 857] (1972);

(2) ensuring that there are not so many items listed on the ballot that "voters would be confronted with a choice so confusing that the popular will could be frustrated," *Williams v. Rhodes, supra,* [393 U.S.] at 33 [89 S.Ct. at 11–12] (1968);

(3) "assur[ing] that the winner [of the election] is the choice of a majority, or at least a strong plurality, of those voting without the expense and burden of run-off elections." *Bullock, supra,* [405 U.S.] at 134 [92 S.Ct. at 851].

■ Despite well-settled law permitting regulation of the electoral process, there has been a need for clarification of the level of scrutiny to be applied to such restrictions. *See, e.g., Trafelet v. Thompson,* 594 F.2d 623 (7th Cir.), *cert. denied* 444 U.S. 906, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979); *Massachusetts Public Interest Research Group v. Secretary of Commonwealth,* 375

Mass. 85, 375 N.E.2d 1175 (1978). The most recent ballot access case decided by the Supreme Court, *Clements v. Fashing,* —— U.S. ——, 102 S.Ct. 2836, 73 L.Ed.2d 508 (decided June 25, 1982), although a plurality opinion, is dispositive of the issue. The existence of barriers to a candidate's access to the ballot "does not of itself compel close scrutiny." *Id.,* 102 S.Ct. at 2843; *Bullock v. Carter, supra,* 405 U.S. at 143, 92 S.Ct. 856. "[N]ot every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." *Id.*

■ The *Clements* Court directed that the proper degree of scrutiny is to be discerned on a case by case basis. Such examination is a matter of degree, necessarily involving consideration of the facts and circumstances underlying the law, the interests which the state seeks to protect and the interests of those who are burdened by the restrictions. *Id.* 102 S.Ct. at 2844; *Storer v. Brown, supra,* 415 U.S. at 730, 94 S.Ct. at 1279; *Williams v. Rhodes, supra,* 393 U.S. at 30, 89 S.Ct. at 10 (1968).

Although "no litmus paper test" has been formulated for culling the valid restrictions on ballot access from the invidious, the cases clearly prohibit the unfair or unnecessary burdening of "the availability of political opportunity", *Lubin v. Panish, supra,* 415 U.S. at 716, 94 S.Ct. at 1320; or restrictions which would impose so great a burden on voters that reasonably diligent persons could be expected to obtain access rarely, if at all. *Storer v. Brown, supra,* 415 U.S. at 742, 94 S.Ct. at 1285.

■ Implied in the prescription for a sliding scale of scrutiny is that ballot access cases do not necessarily impinge on a fundamental right. If they did, strict scrutiny always would be the test. Indeed, the *Clements* court stated that candidacy, for example, is not a fundamental interest which itself requires departure from traditional equal protection, *i.e.,* rational relationship, review.

Far from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.'

102 S.Ct. at 2843; *Bullock v. Carter, supra,* 405 U.S. at 143, 92 S.Ct. at 856. *See also Rodriquez v. Popular Democratic Party,* —— U.S. ——, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982) (no fundamental right to have a special election to fill a vacancy in the Puerto Rico legislature); *Lynch v. Illinois State Board of Elections,* 682 F.2d 93 (7th Cir. 1982) (no fundamental right to a special election in the 17th Ward of the City of Chicago for the purpose of filling a legislative vacancy).

■ One way to rationalize the cases where strict scrutiny was applied absent a fundamental right in candidacy is that where ballot restrictions are so burdensome as to make access virtually impossible, the underlying fundamental right of freedom of association is impaired. Any injury of that magnitude clearly requires that the State demonstrate a compelling interest, served in the least restrictive manner.

With these principles in mind, we turn now to consider whether any or all of the restrictions placed on citizen-initiated advisory public questions, pursuant to Ill. Rev. Stat. ch. 46, §§ 28–1 and 28–6 (1981) will constitutionally survive the glare of either strict or rational relationship scrutiny.

### Rights of Plaintiffs

This is a case of first impression.[8] The United States Supreme Court has never directly spoken to the constitutional dimensions of citizens' rights to the initiative or

---

8. The only analogous case we could find is *Massachusetts Public Interest Research Group v. Secretary of Commerce,* 375 Mass. 85, 375 N.E.2d 1175 (1978). There a public interest research group challenged a county-distribution requirement which restricted the number of signatures that might qualify from any one county on behalf of an initiative or referendum petition. The Supreme Judicial Court of Massachusetts refused to apply strict scrutiny holding that citizens have no fundamental interest in placing measures they favor on the ballot as initiatives and that no other fundamental right, such as in voting, was involved).

referendum process.[9] Certainly it has never considered the constitutional distinction, if any, between public questions which bind the legislature to take action from those which merely seek to "send a message to the legislature."

The Court, however, has, in the context of considering ballot access restrictions on candidacy, approved the initiative and referendum. The Court has characterized them as "basic instrument[s] of a democratic government," *City of Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 679, 96 S.Ct. 2358, 2364–65, 49 L.Ed.2d 132 (1976), a "classic demonstration" *id.,* of "devotion to democracy" *James v. Valtierra,* 402 U.S. 137, 141, 91 S.Ct. 1331, 1333, 28 L.Ed.2d 678 (1971), which give[s] citizens a voice on questions of public policy." *Id.* Perhaps the statement which comes closest to assigning the referendum fundamental right status, albeit also the dicta of a concurring Justice, is found in *Williams v. Rhodes, supra.* In *Rhodes,* Justice Harlan asserted that "[t]he right to have one's voice heard and one's views considered by the appropriate governmental authority is at the core of the right of political association. *Id.* 393 U.S. at 41, 89 S.Ct. at 15–16 (Harlan, J., concurring).

■ Clearly there is no fundamental right to require a referendum under Illinois law. The Illinois Supreme Court in *City of Mt. Olive v. Braje,* 366 Ill. 132, 135, 7 N.E.2d 851, 853 (1937) said:

The legal voters of any such municipality have no inherent or constitutional right to require the governing body to submit any legislation to a referendum. Such requirements exist only by virtue of statutory provisions which the Legislature has the right to impose or withhold. The wisdom of requiring a question to be submitted under certain circumstances, and not under others, is a matter for legislative determination and not for the courts. Thus the power to grant or withhold a referendum rests with the legislature or in a constitutional provision.

Since Illinois does not recognize referenda as fundamental and despite persuasive Supreme Court dicta, we are reluctant to hold that a referendum whereby a citizen-initiated question of public policy may be submitted for voter consideration, is a fundamental right.

■ Having declined the role of trailblazer, we still must determine whether the ballot access restrictions placed on citizen-initiated advisory questions are so restrictive as to render the statutorily granted right meaningless and unconstitutional. If they are, the defendants must satisfy the rigors of strict scrutiny. *See generally* the discussion of the level of scrutiny required by *Clements v. Fashing, supra* and related cases of candidates' ballot access.

■ Furthermore, although the right to place a question on the ballot is not fundamental in Illinois, the legislature has seen

---

**9.** An advisory question of public policy, as contemplated by Ill. Rev. Stat. ch. 26, §§ 28–1 and 28–6 (1981), is in the nature of an "indirect initiative." Illinois, however, characterizes the process as a referendum.

The precise distinction between the initiative and referendum is as follows. Under an initiative, citizens enact legislation by direct vote. Subject to gathering the statutory requisite number of signatures in support of a proposition, the measure appears on the ballot. Generally such measures seek enactment of a statute or call for a constitutional amendment. The proposal also may serve as a nonbinding advisory opinion (or indirect initiative) to elected officials to take a desired action. If the vote is favorable, the legislature must decide whether to adopt the proposal. If the legislative response is unsatisfactory, the proponents' op-

tions vary among the states. A comprehensive description of various state provisions for indirect initiatives is found in Note, Initiative and Referendum—Do They Encourage or Impair Better State Government? 5 Fla. St. U.L. Rev. 925, 932 n. 31 (1977). It is this latter type of initiative, the procedure for which is set out in the Illinois Election Code, which is central to the instant litigation.

The referendum permits voters to ratify or reject measures that the legislature has already approved. Illinois identifies this as "back-door referenda".

*See generally,* Grossman, The Initiative and Referendum Process: The Michigan Experience, 28 Wayne L. Rev. 77 (1981); Sirico, The Constitutionality of the Initiative and Referendum, 65 Iowa L. Rev. 637 (1980).

fit to confer such right. Once Illinois decided to extend this forum, it became obligated to do so in a manner consistent with the Constitution. *See, e.g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (held that once a municipal board has opened up a forum for the presentation of theater, its failure to grant permission for the presentation of a play due to its content constitutes an improper prior restraint that lacked the constitutionally mandated minimum procedural safeguards); *Right to Read Defense Committee of Chelsea v. School Committee of the City of Chelsea,* 454 F.Supp. 703, 712 (D. Mass. 1978) ("[i]t is a familiar constitutional principle that a state, though having acted when not compelled, may consequentially create a constitutionally protected interest").

*The 25 Percent Signature Requirement*

■ There is no question that a state has a legitimate and compelling interest in regulating the number of candidates on the ballot. It may insist that potential candidates "demonstrate a significant modicum of support" sufficient to justify consideration by all voters. *Jenness v. Fortson, supra. See also Bullock v. Carter, supra; American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). Level of support requirements serve, if no other interest, "in avoiding confusion, deception and even frustration of the democratic process at the general election." *Jenness v. Fortson, supra,* 403 U.S. at 442, 91 S.Ct. at 1976.

■ Thus two classes of inter-related interests are involved in level of support requirements: a demonstration of a level of community support as well as minimization of voter confusion. These very real concerns expressed relative to candidate access to the ballot, apply equally to the placement of public questions on the ballot.

■ In the instant case, however, we believe that the 25 percent signature requirement for advisory questions is "overkill." It is true that the 25 percent signature requirement, if met, would function to demonstrate community support.[10] It also is true, however, that the restriction meets the *Storer* test of being so high that a reasonably diligent person could not be expected to meet it. *Storer v. Brown, supra,* 415 U.S. at 742, 94 S.Ct. at 1285.

There is no evidence that any group has ever gathered the requisite number of signatures in DuPage County. In the case of the DuPage Citizens for a Nuclear Arms Freeze, a professional coordinator was hired to oversee the petition drive and coordinate and train petition solicitors. The canvassers sent out approximately 5,000 petitions. Nonetheless, plaintiffs were able to gather only 8,500 signatures, approximately ⅛ of the necessary requirement.

If professionals cannot gather the threshold number of signatures, how much more difficult will it be for a group of citizens without professional backup to get their advisory question on the ballot. Certainly we cannot suppose that the Legislature intended that professional canvassers be employed in order to allow citizens to exercise their statutory right to place on the ballot advisory public questions.

Accordingly we find that the effect on the voters of this level of support restriction is overly burdensome. In practice, the 25 percent requirement overburdens the very right which the legislature has created. Strict scrutiny of the 25 percent signature minimum, therefore, is triggered.

■ The state has not carried its burden by satisfactorily explaining why its legitimate need to predetermine voter interest or to minimize voter confusion[11] cannot be

10. In fact, the percentage of signatures required, 25, was higher than the percentage of voters which turned out to vote in DuPage County in the March 1982 primary election. At that primary not quite 23 percent of the eligible persons voted, or approximately 73,000 voters.

11. This requirement also does not meet the state's interest in avoiding voter confusion. The state's argument is that a large number of questions which allegedly will result from a lesser signature requirement, will facilitate voter boycott or dismay. First, plaintiffs have

attained through a less restrictive or lower percentage of signatures requirement.

Although the 25 percent restriction is unconstitutional, the Court will not rewrite the statute by prescribing some lesser percentage. This matter has been heard on a motion for a preliminary injunction which of necessity was quickly prepared by the parties. There was little discovery and the factual record is inadequate for an exhaustive determination of what the proper percentage might be.

It is also unnecessary to decide what percentage of signatures will pass constitutional muster because we reject plaintiffs' remaining contentions that the limit of three public questions on a first-come/first-served basis are unconstitutional. Despite the unconstitutionality of the signature requirement, plaintiffs, in the posture of this case, could not have earned a ballot position even with some lesser percentage.

*Only The First Three Validly Initiated Public Questions May Appear on the Ballot*

■ The statute requires that only the first three validly initiated public questions may appear on any one ballot. Ill. Rev. Stat. ch. 46, § 28–6 (1981). This provision falls equally on all questions of public policy, regardless of their source of initiation or legal effect. As no fundamental right exists in citizen-initiated public questions, in-

validation of these provisions only can occur where they are not rationally related to the legislative purpose or are overly burdensome. The norm which we must follow is to give much deference to the legislative design of the Illinois Unified Election Code. *Lynch v. State Board of Elections, supra.*

Although the number three likely was chosen in an arbitrary fashion, we cannot say that the limit is so onerous or restrictive as to meaningfully preclude public questions from the ballot. Clearly it rationally serves the interest of avoiding a cluttered ballot. Thus if three questions are timely and properly submitted, they will appear on the ballot.

Similarly the fact that only the *first* three validly initiated questions gain a ballot slot is not improper. If the length of the ballot is to be circumscribed and if more than the number of questions permitted are validly filed, there must be some method of determining which question will reach the ballot. The method set forth in section 28–1 seems fair.

First, by utilizing a first-come/first-served procedure, a determination based on the content of the question or a weighing of its source is avoided. Such factors, if employed, clearly would be arbitrary and capricious.

Second, this statute, by awarding diligence, applies a similar concept utilized

directed us to the "California experience," where citizens have been asked to vote on as many as 31 public questions at one time (June 8, 1982 Primary Election, San Francisco, California). Rather than decreasing voter participation, it is argued that the multiplicity of these propositions, as they are called in California, and their varied nature, have increased not decreased voter turnout.

Second, confusion is controlled relative to public questions because voters are not asked to pick among such questions, as is true when they are selecting among candidates. Illinois law requires that each question of public policy be self-contained and confined to a simple "yes or no" choice. Ill. Rev. Stat. ch. 46, § 16–7 (1981). *See also Village of Deerfield v. Rapka*, 54 Ill.2d 217, 296 N.E.2d 336 (1973) (separate and independent questions may not be combined and submitted to the voters in one proposition in such a way as to place the voter in the

position of having to vote for or against both questions when he might otherwise favor one but oppose the other).

Finally, and most significantly, there is a built-in check on voter confusion because the statute limits to three the number of public questions which may appear on the ballot of any one political subdivision. The statutory limit to three is somewhat misleading. It is possible that a voter may be asked to consider at the same time three public questions on the ballot of more than one subdivision. For example, a resident of DuPage County may be asked to vote on three questions proposed county-wide as well as on three each from his village, school district, water district, and library district. In this hypothetical, a voter could be faced with 15 public questions. Nonetheless, gross proliferation of public questions apparently has not occurred often (or at all).

with respect to candidate nominating petitions, *i.e.*, candidates are assigned places on the ballot in the order in which their nominating petitions are filed with the appropriate election official. Ill. Rev. Stat. ch. 46, §§ 7–14 and 10–14 (1981).

Finally, even where four or more questions of public policy are validly submitted, the statute provides a saving clause: The extra questions shall be certified as the first validly initiated proposition(s) in the next regular election, no more than one year subsequent to the filing of the initiating petition or the adoption of an ordinance or resolution by a political subdivision. Ill. Rev. Stat. ch. 46, § 28–5 (1981). The prerequisite to this holdover provision is that the petition, resolution or ordinance proposing a public question does not specify a particular election for its submission.

 In the instant case, plaintiffs indicated on their petition that the question on limiting nuclear arms should be presented at the November 1982 election, thereby relinquishing the right to a holdover place on the ballot. Notwithstanding the fact that they did not meet the unconstitutionally high signature requirement, testimony indicated that their petition would have been first in line for inclusion on the ballot of the next regularly scheduled election had they not elected to ignore section 28–5. In this case, plaintiffs themselves have made the statute more restrictive than it is intended.

Rather than being overly intrusive or oppressive, the holdover clause mitigates some of the harshness which necessarily attends the imposition of an absolute limit on the number of questions which will appear on one ballot. It therefore addresses the concern expressed in *Williams v. Rhodes* that the "entangling web of election laws" might accumulate to prevent access to the ballot. 383 U.S. at 35, 89 S.Ct. at 12 (Douglas, J., concurring).

 Furthermore, the limit of three public questions, in conjunction with the holdover clause, present only a *de minimus* burden on a citizen's access to the ballot. In that regard, it is similar to the two-year

waiting period imposed on a "sitting" Justice of the Peace who seeks election to the Texas Legislature. This legislative scheme recently was approved in *Clements v. Fashing, supra.* In *Clements,* the Court held that the waiting period "places a *de minimus* burden on the political aspirations of a current officeholder," which "is hardly a significant barrier to candidacy." *Id.* 102 S.Ct. at 2848. Similarly, a maximum of three public questions, reserved for those which are filed first, does not significantly prevent plaintiffs from exercising their first amendment rights if they do not specify an election date on their petitions.

 Plaintiffs also charge that their equal protection rights are violated because by limiting public questions to the first three validly submitted, an advantage is created in favor of citizen-initiated binding questions requiring less than 25 percent signatures and resolutions passed by a political subdivision, requiring no signatures. This advantage will, it is said, result in excluding from the ballot non-binding citizen-initiated public questions because it is too hard for such questions to be filed first.

Plaintiffs' claims in this regard do not rise to constitutional dimension. Where no fundamental right is at stake, a statute which classifies among groups need only be rationally related to the legislative purpose. The courts have consistently held that parity among classifications is unnecessary. Indeed, equality of restriction or effect may not be desirable. *See, e.g., Jenness v. Fortson, supra,* 403 U.S. at 442, 91 S.Ct. at 1976 ("sometimes the grossest discrimination can lie in treating things that are different as though they are exactly alike"); *Bowe v. Board of Elections Commissioners of Chicago,* 614 F.2d 1147 (7th Cir. 1980) (minimum signature requirement applied toward committeeman was not excessive even though greater than the minimum requirements for other offices).

Thus, the bare fact of a disparity is not unconstitutional nor can we say that this disparate plan is not rationally related to the Legislature's interest in minimizing ballot confusion. We therefore conclude that

restrictions on citizen-initiated advisory questions, pursuant to Ill. Rev. Stat. ch. 46, §§ 28–1 and 28–6 (1981), exclusive of the 25 percent signature requirement, do not unconstitutionally impair plaintiffs' first or fourteenth amendment rights. Accordingly, plaintiffs' motion for a preliminary injunction is denied.

IT IS SO ORDERED.