MASSACHUSETTS PUBLIC INTEREST RESEARCH GROUP & others *vs.* SECRETARY OF THE COMMONWEALTH & others.

Suffolk. February 17, 1978. — April 20, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Constitutional Law,* Initiative, Equal protection of laws, Separable portions of constitution.

Discussion of the procedure for the adoption of a law through a popular initiative as set forth in art. 48 of the Amendments to the Massachusetts Constitution. [86-89]

A corporation organized under G. L. c. 180 had no standing in an action seeking relief against the enforcement of the county-distribution requirement of art. 48 of the Amendments to the Massachusetts Constitution. [90-91]

Where it appeared doubtful whether art. 48 of the Amendments to the Massachusetts Constitution would have been adopted without the county-distribution provision, that provision, if unconstitutional, would not be severable from the rest of the article. [91-92]

The county-distribution rule embodied in art. 48 of the Amendments to the Massachusetts Constitution does not impinge on any fundamental interest, and, therefore, the strict scrutiny standard of equal protection review is not applicable to the rule. [92-96]

The county-distribution rule embodied in art. 48 of the Amendments to the Massachusetts Constitution does not violate the equal protection clause of the Fourteenth Amendment to the United States Constitution. [96-97]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on January 6, 1978.

The case was reserved and reported by *Wilkins,* J.

*Robert J. Gaines* (*Charles Harak* with him) for the plaintiffs.

*Leo S. McNamara,* Assistant Attorney General, for the Secretary of the Commonwealth.

*Robert G. Bleakney, Jr., James S. Rogers, C. Duane Aldrich & Richard W. Blackburn,* for the New England Telephone & Telegraph Company, submitted a brief.

HENNESSEY, C.J. This is an action brought in the Supreme Judicial Court for Suffolk County seeking declaratory and injunctive relief against the enforcement of the county-distribution requirement, embodied in art. 48 of the Amendments to the Constitution of the Commonwealth, General Provisions, II, and read into art. 48, The Initiative, V, § 1, as amended by art. 81, § 2. This requirement restricts the number of signatures that may qualify from any one county on behalf of an initiative or referendum petition to not more than one-quarter of the total number needed to qualify. The plaintiffs question the validity of the county-distribution requirement, the application of which has prevented the Secretary of the Commonwealth (Secretary) from transmitting the plaintiffs' initiative petition to the General Court. Unless it is so transmitted, the initiative question cannot be placed on the November, 1978, election ballot.

The case was submitted to a single justice of this court on a statement of agreed facts and exhibits. The matter was reserved and reported by him to the full bench on the pleadings and the statement of agreed facts and exhibits therein. We conclude that the county-distribution requirement is constitutional, and a declaration to that effect shall be entered.

The relevant constitutional provisions, and the facts of this case, are summarized as follows.

*The Popular Initiative*

Under the provisions of the Constitution of the Commonwealth, legislative power is vested primarily, but not exclusively, in the General Court. Through the popular initiative

and referendum, the power to enact or to repeal certain legislation of Statewide applicability is reserved to the people. The popular initiative is described in the Constitution as "the power of a specified number of voters to submit constitutional amendments and laws to the people for approval or rejection." Art. 48, The Initiative, I.

An initiative petition may propose only measures of Statewide applicability. The Constitution specifically excludes from the initiative process laws whose operation would be restricted to a particular town, city, county or other political division or to particular districts or localities of the Commonwealth. Art. 48, The Initiative, II, § 2.

The procedure for the adoption of a law through a popular initiative is set forth in art. 48, which was proposed at the Constitutional Convention of 1917-1918, and later approved by the electorate at the general election held on November 5, 1918. Under the provisions of that article, any ten qualified voters of the Commonwealth, without regard to their county of residence, may draw up and sign an initiative petition containing the full text of the law proposed by the petition. This petition must be submitted to the Attorney General no later than the first Wednesday in the August next preceding the assembly of the General Court for the session in which it is to be introduced. If the Attorney General certifies that the petition is in the proper form, does not contain excluded matter, and is not substantially the same as any measure that has been submitted to the people at either of the two preceding State elections, the petition may be filed with the Secretary. On receipt of the petition, the Secretary prepares blank signature sheets for the use of subsequent signers, containing a summary of the proposal prepared by the Attorney General, and the names and addresses of the first ten signers. The initiative petition can be filed with the Secretary no earlier than the first Wednesday in September. Art. 48, The Initiative, II, § 3, as amended by art. 74 of the Amendments.

An initiative petition must be signed by a number of qualified voters which is at least equal to three per cent of the

entire vote cast for Governor at the preceding gubernatorial election. Art. 48, The Initiative, V, § 1, as amended by art. 81, § 2. The Secretary has determined that, for measures proposed for adoption in 1978, the number of signatures required is 55,644.

Although the fourteen counties of the Commonwealth vary enormously in population and in their numbers of registered voters,[1] the so called county-distribution rule, art. 48, General Provisions, II, provides that: "Not more than one-fourth of the certified signatures on any petition shall be those of registered voters of any one county." Consequently, for measures proposed by initiative in 1978, no more than 13,911 signatures from any one county may be counted toward the total number of signatures required.

The county-distribution rule limits the number of additional signatures that can be counted from any one county. Using 1977 as an example, not more than one-quarter of the required 55,644 signatures could come from any one county, and once 13,911 valid signatures were collected in any one county, the signatures of additional voters in that county were rendered meaningless by operation of the county-distribution rule.

Prior to the first Wednesday in December, local officials must certify the required number of signatures as valid signatures of registered voters, and the petitioner must file those signatures with the Secretary. Art. 48, The Initiative, II, § 3. See generally, *Opinion of the Justices*, 370 Mass. 869, 870-872. (1976). A petition signed by the required number of qualified voters must be transmitted by the Secretary to the clerk of the House of Representatives as soon as the Legislature convenes. Art. 48, The Initiative, II, § 4. If the General Court fails to enact the law proposed by the petition prior to the first Wednesday in May, the petitioners may collect an additional number of signatures to place the

---

[1] According to statistics prepared by the Secretary, there were 771,870 registered voters in Middlesex County in 1976. In contrast, Nantucket County had 3,750 voters, and Dukes County had 6,796 voters.

proposal on the ballot at the next State election. The additional number of certified signatures necessary for this procedure is equal to one-half of one per cent of the entire vote cast for Governor at the preceding gubernatorial election. Art. 48, The Initiative, V, § 1.

A law proposed by a popular initiative may be enacted by a majority of those voting on the measure, provided that it receives at least thirty per cent of the total number of votes cast at the election. Art. 48, The Initiative, V, § 1. The veto power of the Governor does not extend to measures approved by the people in this manner. Art. 48, General Provisions, V.

*The Instant Case*

On August 3, 1977, ten qualified voters submitted to the Attorney General a popular initiative petition calling for the enactment of a general law to establish a public corporation, The Telephone Consumers' Action Group, Inc. (TELCAG), which would have the purpose of representing the interests of consumers in the regulation of residential telephone rates and services. The corporation would be required to receive and respond to consumers' grievances in the use of residential telephone service. It would be empowered to represent consumer interests before regulatory boards and in the courts and to compile and disseminate consumer information to the public. The proposal would not affect the authority of the Attorney General to intervene in these proceedings. Funds for the operation of the corporation would be solicited through the telephone company's billing system. Directors of the corporation would be elected by the contributors.

After reviewing the TELCAG petition, the Attorney General certified that it was in the proper form and did not relate to matters of purely local concern or to other excluded subjects. The petition was timely filed with the Secretary who prepared the signature sheets for additional signatures. Between September 22, 1977, and November 30, 1977, supporters of the TELCAG proposal circulated the signature sheets and collected approximately 87,500 signatures. These

signatures, which were collected in communities in each of the fourteen counties of the Commonwealth, were timely submitted to the appropriate officials in the cities and towns for certification. Of the 87,500 signatures, 61,676 were certified to be registered voters by the appropriate officials in the various cities and towns. The signature sheets bearing the collected signatures were filed with the Secretary on or before the first Wednesday in December of 1977.

The Secretary did not, however, transmit the petition to the clerk of the House of Representatives. In a letter dated December 14, 1977, addressed to an agent of the petitioners, the Secretary acknowledged receipt of the 61,676 certified signatures, but indicated that, if the county-distribution rule were applied, only 54,528 could be allowed. Subsequently, by letter dated January 5, 1978, the Secretary informed the first ten signers that he would not count more than 13,911 signatures from any one county and that he was rejecting the petition on the ground that only 54,528 signatures could be allowed.

The Secretary disallowed 5,353 signatures from Middlesex County and 1,795 signatures from Suffolk County. As a result, the petition fell 1,116 signatures short of the 55,644 required for transmittal to the General Court.

In his letter of January 5, 1978, the Secretary expressed his belief that the county-distribution requirement was unconstitutional, but that he did not have the power to transmit the petition to the General Court until the courts so ruled.[2] On January 6, 1978, the plaintiffs commenced this action seeking declaratory relief, alleging that the enforcement of the county-distribution rule deprived them of equal protection of the laws, as guaranteed by the Fourteenth Amendment to the United States Constitution.

1. *Standing.* We dispose, first, of the question of the standing of the plaintiff, Massachusetts Public Interest

---

[2] The Secretary acted correctly here. Despite his own opinion as to the Federal constitutional issue, he rightly declined to act because the petition did not comply with the requirements of the Massachusetts Constitution.

Research Group. It is a corporation organized under G. L. c. 180. As such it has no right to vote and no right to submit initiative petitions for enactment by the people. It has asserted no rights guaranteed it under the Constitution of the United States, and thus has no standing in this case. See *First Nat'l Bank* v. *Attorney Gen.*, 371 Mass. 773, 783-785 (1977); *First Nat'l Bank* v. *Attorney Gen.*, 362 Mass. 570, 582, 590 (1972). There are other plaintiffs who have standing, and for that reason it is not crucial for the plaintiffs to establish the standing of the corporate plaintiff. Nevertheless, the declaration of rights which is to ensue here should, of course, make a declaration as to the corporation's lack of standing.

2. *Severability*. It seems clear to us that the county-distribution rule was not intended by the adopters of art. 48 to be severable from the rest of the article if that distribution rule were found to violate the Federal Constitution. The county-distribution provision, devised, apparently, to discourage the use of the initiative for wholly regional or local issues, was inserted in the first draft of art. 48 reported by the Committee on Initiative and Referendum at the Massachusetts Constitutional Convention of 1917-1918. See Legislative Reasearch Council, Report Relative to Revising Statewide Initiative and Referendum Provisions of the Massachusetts Constitution, 1975 House Doc. No. 5435, at 58-59. The provision became one of the most hotly debated issues of that convention and consumed forty-five days of the convention's time. The significance of the county-distribution rule to art. 48 as a whole is reflected in the primacy afforded that provision in the version finally adopted by the electorate. The county-distribution rule stands alone in the Constitution as Part II of the General Provisions of art. 48.

This court has recognized a strong policy in favor of preserving our laws in the face of constitutional challenges whenever possible. See *Ferguson* v. *Commissioner of Corps. & Taxation*, 316 Mass 318 (1944); *Baird* v. *Davoren*, 346 F. Supp. 515 (D. Mass. 1972). See also Stern, Separability and Separability Clauses in the Supreme Court, 51 Harv. L.

Rev. 76 (1937). Nevertheless, it is doubtful whether art. 48 as a whole could have been adopted without the county-distribution provision. In the circumstances, therefore, we conclude that if the county-distribution rule violates the Federal Constitution, then the initiative provision of art. 48 is wholly inoperative. See *Commonwealth* v. *Baird,* 355 Mass. 746, 755 (1969). The consequence, of course, would be that these or any other plaintiffs would have no right to place an initiative proposal on the ballot of this or any other State election unless a new constitutional amendment were adopted.

3. *Equal protection.* The county-distribution provisions of art. 48 may result in inequality, because enforcement of the rule means that the signatures gathered by the sponsors of the petition may not all have equal legal significance. The question before the court is whether this inequality renders art. 48 unconstitutional. We conclude that it does not.

As a preliminary matter, we consider the standard of equal protection scrutiny applicable to this case. The plaintiffs assert that the strict scrutiny standard of equal protection review is applicable, arguing that the county-distribution rule affects the fundamental right to vote.[3] We start from the premise, however, that "the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the

---

[3] All the parties before us have examined the relevant decisions, particularly those of the Supreme Court of the United States as relating to one pole or the other: strict scrutiny on the one hand, or rational basis on the other hand. The precedents, summarized *infra,* support the validity of the parties' approach. As to this sometime tendency toward polarization in discussion of the standard of review, we have said: "The cases at times speak of legislation which need only undergo a test of 'reasonable relation' and legislation that must survive 'strict scrutiny,' but we conceive that these soubriquets are a shorthand for referring to the opposite ends of a continuum of constitutional vulnerability determined at every point by the competing values involved." *Marcoux* v. *Attorney Gen., ante* 63, 65 n.4 (1978).

achievement of the State's objective." *McGowan* v. *Maryland*, 366 U.S. 420, 425 (1961). This court must give due regard to "the presumption of constitutionality to which every duly enacted state and federal law is entitled," *Lockport* v. *Citizens for Community Action at the Local Level*, 430 U.S. 259, 272 (1977), and this presumption that must be given particular force in regard to a State constitutional provision adopted by vote of the people of the State. See *Raton* v. *Sproule*, 78 N.M. 138 (1967); *Southern Ry.* v. *Fowler*, 497 S.W.2d 891 (Tenn. 1973). As a general rule, a provision of law — even one that results in some inequality — "will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan* v. *Maryland, supra* at 426. See *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539 (1974).

In certain classes of cases, of course, a more rigorous standard of scrutiny is appropriate. These are cases in which the challenged provision rests on a suspect classification[4] or impinges on a fundamental interest.[5] In cases where strict scrutiny is appropriate, the State must demonstrate affirmatively that the challenged provision promotes a compelling State interest which could not be achieved in any less restrictive manner. See, e.g., *Dunn* v. *Blumstein* 405 U.S. 330, 337 (1972). No suspect classification is involved in this case, but the plaintiffs argue that a fundamental interest in voting may be involved in one of several ways.

Taking a broad view of the Supreme Court's voting cases, the plaintiffs maintain that the highest level of judicial scrutiny must be applied to geographical classifications affecting public ballot questions of all kinds, regardless of whether

---

[4] *Loving* v. *Virginia*, 388 U.S. 1 (1967) (race). See *Commonwealth* v. *King*, 374 Mass. 5 (1977) (gender); *Sugarman* v. *Dougall*, 413 U.S. 634 (1973) (alienage); *Levy* v. *Louisiana*, 391 U.S. 68 (1968) (legitimacy of birth).

[5] See, e.g., *Kramer* v. *Union Free School Dist. No. 15*, 395 U.S. 621 (1969) (access to voting); *Shapiro* v. *Thompson*, 394 U.S. 618 (1969) (interstate migration); *Skinner* v. *Oklahoma*, 316 U.S. 535 (1942) (procreation).

the challenged provision concerns the petitioning or the voting stage of the election process. On its face, the plaintiffs' assertion is appealing — voting has long been recognized as a fundamental political right and indeed the "preservative of all rights." *Yick Wo* v. *Hopkins,* 118 U.S. 356, 370 (1886). See *Reynolds* v. *Sims,* 377 U.S. 533, 561-562 (1964). On closer examination, however, the thicket of strict scrutiny cases relied on by the plaintiffs separates into distinguishable groups, and it appears that the plaintiffs' case does not fall within any one of them.

The Supreme Court has made it clear "that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn* v. *Blumstein, supra* at 336. See, e.g., *Hill* v. *Stone,* 421 U.S. 289 (1975); *Kramer* v. *Union Free School Dist. No. 15,* 395 U.S. 621 (1969); *Harper* v. *Virginia Bd. of Elections,* 383 U.S. 663 (1966); *Louisiana* v. *United States,* 380 U.S. 145 (1965). Classifications imposing conditions of eligibility on otherwise qualified voters have been reviewed with strict scrutiny, but these cases are not applicable here. The county-distribution rule in no way affects the right of qualified voters to cast their votes for or against an initiative proposal properly on the ballot.

The reapportionment cases cited by the plaintiffs similarly are inapplicable. See, e.g., *Reynolds* v. *Sims,* 377 U.S. 533 (1964). In *Reynolds,* the Supreme Court considered charges that voters in one part of Alabama had greater representation per person in the State Legislature than voters in another part of the State. The Court held that "the fundamental principle of representative government in this country is one of equal representation for equal numbers of people" and that the alleged dilution of the plaintiffs' vote required that their claim be "carefully and meticulously scrutinized." *Id.* at 560-561, 562. See *Connor* v. *Finch,* 431 U.S. 407 (1977). The "one person, one vote" principle evolved in the reapportionment cases may be said to apply with equal force to votes cast in a referendum, at least where all the voters have substantially identical interests in the

adoption of the proposal in issue. *Lockport* v. *Citizens for Community Action at the Local Level,* 430 U.S. 259, 268 (1977). See, e.g., *Cipriano* v. *Houma,* 395 U.S. 701 (1969). However, the county-distribution rule affects only whether certain signatures on the initiative petition are counted. In no way does the rule invalidate or dilute any citizen's vote.

The plaintiffs' reliance on the ballot-access cases involving candidates for public office similarly is misplaced. Federal decisions suggest that strict scrutiny is appropriate in reviewing challenges to State requirements tending to prevent third-party and independent candidates from gaining a place on the ballot, since "an attempt to freeze the *status quo* cannot be a reasonable regulation of the electoral process." *Baird* v. *Davoren,* 346 F. Supp. 515, 520 (D. Mass. 1972). See *Moore* v. *Ogilvie,* 394 U.S. 814 (1969); *Williams* v. *Rhodes,* 393 U.S. 23 (1968).[6] Thus, some courts have declared unconstitutional county-distribution rules which required candidates to gather a minimum number of voter signatures from each of several counties. See *Socialist Workers Party* v. *Rockefeller,* 314 F. Supp. 984 (S.D.N.Y.), aff'd 400 U.S. 806 (1970); *Socialist Workers Party* v. *Hare,* 304 F. Supp. 534 (E. D. Mich. 1969). But see *Zautra* v. *Miller,* 348 F. Supp. 847 (D. Utah 1972); *Moritt* v. *Governor of N.Y.,* 42 N.Y.2d 347 (1977), appeal dismissed, 434 U.S. 1029 (1978). Similarly, the Federal court in *Baird* v. *Davoren, supra,* held unconstitutional a Massachusetts statute embodying a county-distribution rule similar to the one here in issue — that is, one which required that no more than a certain number of signatures from any one county be counted toward the total number of signatures necessary to

---

[6] We note, however, that although the Supreme Court continues to speak of strict scrutiny as being applicable in this context, cases decided since *Williams* v. *Rhodes, supra,* suggest that the Court actually applies a more flexible standard. See *American Party* v. *White,* 415 U.S. 767 (1974); *Storer* v. *Brown,* 415 U.S. 724 (1974); *Jenness* v. *Fortson,* 403 U.S. 431 (1971). See generally Note, Nominating Petition Requirements for Third-Party and Independent Candidate Ballot Access, 11 Suffolk U.L. Rev. 974, 979-983 (1977).

place the candidate's name on the ballot. *Id.* at 518. The decision in *Baird* v. *Davoren, supra,* as in other ballot-access cases, appears to rest primarily on the interest of qualified voters in voting for representatives of their choice. *Id.*[7] See *Moore* v. *Ogilvie, supra* at 820. This interest would not be served by applying strict scrutiny in the instant case, where no representation is involved.

It appears that the fundamental interest in voting is not involved in this case. Moreover, it cannot be maintained that citizens have a fundamental interest in placing measures they favor on the ballot as initiative questions, because no such right is "explicitly or implicitly guaranteed by the Constitution." *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U.S. 1, 33-34 (1973). We conclude, therefore, that strict scrutiny is not appropriate.

On the contrary, judicial precedent indicates that the county-distribution rule need only constitute a reasonable means toward a legitimate State purpose. See *Driskell* v. *Edwards,* 413 F. Supp. 974 (W.D. La.), aff'd 425 U.S. 956 (1976); *Livingston* v. *Ogilvie,* 43 Ill. 2d 9 (1969); *Stander* v. *Kelley,* 433 Pa. 406, cert. denied sub nom. *Lindsay* v. *Kelley,* 395 U.S. 827 (1969); *West* v. *Carr,* 212 Tenn. 367 (1963), cert. denied, 378 U.S. 557 (1964). These cases involved the selection of delegates to State constitutional conventions, and, in each case, the rational basis standard of review was held to apply. For example, in *Driskell* v. *Edwards, supra,* only 105 of the 132 delegates to a Louisiana constitutional convention were elected; the balance were appointed by the Governor. The court noted that "the delegates . . . exercised no function other than to draft proposed changes to Louisiana's Constitution, which proposals would be submitted to the people for approval or rejection, and would become law only if ratified by the people." *Driskell* v. *Edwards, supra* at 977. As in the constitutional conven-

---

[7] A second basis for the decision clearly is not involved in this case. That is the associational interest of voters in forming a political party to advance their political beliefs. *Baird* v. *Davoren, supra* at 518. See *Williams* v. *Rhodes, supra* at 31.

tion cases, the step of obtaining signatures on an initiative petition has no function other than proposing a measure for consideration by the General Court or by the electorate. As in those cases, a measure proposed by initiative can become law only if adopted by vote of the General Court or the electorate. These cases persuade us that the county-distribution rule is constitutional if it has a conceivable rational basis. *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 542 (1974).

The county-distribution rule clearly satisfies this standard. In adopting art. 48, the voters of the Commonwealth reasonably could have concluded that to guard against the proliferation of ballot questions that are essentially local in effect was in the public interest and in the interest of good government. The plaintiffs insist that the county-distribution rule is an unreasonable means toward this concededly legitimate State goal. They argue that the county-distribution rule does not guarantee Statewide support for proposals on the ballot, but, in taking this position, the plaintiffs argue merely that a more nearly perfect system could have been devised for ensuring Statewide support. We bring no such scrutiny to this case. It is sufficient that the county-distribution rule is reasonably calculated to keep proposals of exclusively local concern off the ballot. We conclude that the county-distribution rule does not violate the equal protection clause of the Fourteenth Amendment, and a declaration to that effect shall be entered in the county court.

*So ordered.*