Wendy A. GEORGES, et al., Plaintiffs-Appellants,

v.

Clifford M. CARNEY, Jean McNamara and William Toerpe, Defendants-Appellees,

and

Illinois State Board of Elections, Intervening Defendant.

No. 82–2400.

United States Court of Appeals, Seventh Circuit.

Submitted Sept. 15, 1982.

Decided Sept. 16, 1982 *.

* This opinion was prepared subsequently, and released on October 1, 1982. This procedure was necessary in order to make it possible for the Board of Election Commissioners of Du-Page County to print absentee ballots for the November election by September 18, the print-er's deadline which if missed would have resulted in sharply higher printing costs to the Board and could also have resulted in some absentee voters not receiving their ballots in time to vote in the election.

Jayne W. Barnard, Jenner & Block, Chicago, Ill., for plaintiffs-appellants.

Thomas C. Kelleghan, Wheaton, Ill., for defendants-appellees.

James M. Scanlon, Ill. State Bd. of Elections, Tyrone C. Fahner, Atty. Gen. of Ill., Chicago, for intervenor-defendant.

Before CUMMINGS, Chief Judge, and CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

This appeal from the denial of a preliminary injunction brings up to us questions of freedom of speech and of equal protection of the laws arising from the methods by which the Illinois Election Code rations access to the ballot by those who wish to put to the electorate a question rather than a candidate. The plaintiffs in this action under 42 U.S.C. § 1983 are members of the DuPage County Citizens for Nuclear Arms Freeze. They want the ballot in DuPage County in the next general election, which is to be held on November 2, 1982, to contain a question asking, "shall the people of the County of DuPage endorse the call to halt the nuclear arms race and request the DuPage County Board ... to adopt an immediate, mutual, and verifiable freeze on all further testing, production and deployment" of Soviet and American nuclear weapons "followed by reductions of present nuclear weapons?" In the nomenclature of the Illinois Election Code this is an "advisory" question, see Ill.Rev.Stat. 1981, ch. 46, §§ 28–1, 28–6, because, despite its wording, the adoption by the DuPage County Board of a freeze on Soviet and American nuclear weapons would have no legal effect; and anyway the voters are just being asked to "request" action of the Board. A "binding" question, in contrast, proposes to the electorate a course of action

that, if the electorate approves, becomes law. See Ill.Rev.Stat.1981, ch. 46, § 28–1.

For a private group, as distinct from a public body such as a county board, to get an advisory question placed on the ballot in a local political subdivision of Illinois requires the signatures of 25 percent of the registered voters in the subdivision. Ill. Rev.Stat.1981, ch. 46, § 28–6. This hurdle seems to be nearly impossible to leap, at least in DuPage County. A summer of vigorous canvassing with the assistance of a professional canvasser yielded 8,500 signatures for the question on a nuclear arms freeze, and although this was more than had ever been obtained, so far as anyone could recall (there are no reliable statistics), for an advisory question in DuPage County, it fell far short of the 75,000 that would have been required to meet the 25 percent requirement in DuPage. And even if this Sisyphean task had been accomplished it would have done these plaintiffs no good. Section 28–1 of the Election Code limits the number of questions that can be placed on the ballot to three, and provides that if more than three are submitted to the local election board the first three will appear on the ballot. Ill.Rev.Stat.1981, ch. 46, § 28–1. The plaintiffs' question was fifth in line. The DuPage County Board—which, being a public body, is not required to obtain any signatures in order to submit a question— had submitted four questions after the plaintiffs had begun their canvass but before they had given up on obtaining the signatures of 25 percent of the registered voters and had submitted their question without the required number of signatures. All four of the Board's questions were binding questions, having to do not with nuclear issues but with local issues of water supply and the like. So far as the record discloses, public bodies in DuPage County such as the County Board have never submitted advisory questions.

In asking that the election commissioners of DuPage County be enjoined from preparing ballots for the November election that do not contain the nuclear arms freeze question, the plaintiffs argue that the 25

percent requirement, the limit of three questions per ballot, and the first-come first-served method of choosing the three from among those submitted infringe their freedom of speech under the First Amendment, which has, of course, been held applicable against the states by virtue of the due process clause of the Fourteenth Amendment. The plaintiffs also argue that the Election Code violates the equal protection clause of the Fourteenth Amendment by making it (1) easier for public bodies than for private groups to put a question on the ballot and (2) harder for private groups to get advisory questions on the ballot than to get certain kinds of binding questions on it. For example, only 1000 signatures are required to place on the ballot a proposal to establish a home for wayward minors, Ill. Rev.Stat.1981, ch. 23, § 2686, and only 100 for a proposal for a property tax to support a county fair, Ill.Rev.Stat.1981, ch. 34, § 2442.

Challenges to state election laws on federal constitutional grounds are legion, see, e.g., *Clements v. Fashing*, —— U.S. ——, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982), but this is the first case we have found in which the challenged laws involve the regulation of ballot propositions rather than of candidacy, except for *Massachusetts Public Interest Research Group v. Secretary of the Commonwealth*, 375 Mass. 85, 375 N.E.2d 1175 (1978), which involved a challenge to the geographical weighting of votes for propositions and so was a kind of reapportionment case. It and the candidate cases involve such different issues from those in this case that we must treat this as a genuine case of first impression and decide it on the basis of fundamental principles, though we derive a little help, as will appear, from two "public forum" cases, *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981), and *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974).

The First Amendment's prohibition against governmental abridgments of freedom of speech and of the press is, as is the Bill of Rights in general, a guarantee of negative rather than of positive liberties. It forbids government to interfere with the competition of ideas but does not require it to create a well informed citizenry—to subsidize newspapers or book publishing or soundtrucks or soapboxes. *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, supra*, 453 U.S. at 151 n.10, 101 S.Ct. at 2696 n.10 (Marshall, J., dissenting); cf. *Harris v. McRae*, 448 U.S. 297, 318, 100 S.Ct. 2671, 2689, 65 L.Ed.2d 784 (1980).

Consistently with this distinction the parties to this litigation agree that there is no constitutional right to use the ballot box as a forum for advocating a policy, such as a freeze on nuclear weapons, and that Illinois therefore has no constitutional obligation to allow advisory questions to be placed on the ballot. Not all states make provision for including such questions on the ballot, and the plaintiffs have no quarrel—no constitutional quarrel, at any rate—with states that do not.

Nor should it make a difference whether a state that does not provide for advisory questions does provide for binding questions. The submission of binding questions to the electorate—the initiative, as in this case, or the referendum—is a technique of direct, as distinct from representative, democracy. It allows the people to vote directly for a law rather than indirectly by voting for the lawmaker. We do not think that by opting for a measure of direct democracy a state obliges itself to allow the ballot also to be used as a means of pure advocacy. Such an obligation would have no basis in the logic of the First Amendment. Direct democracy is not an interference with the marketplace of ideas; it therefore does not put the state under an obligation to compensate for such an interference by taking measures to promote or enlarge that marketplace, as by allowing the ballot to be used to take official polls on controversial issues of public policy.

*Lehman v. City of Shaker Heights, supra,* supports this conclusion. The city owned a bus line, and while it allowed commercial advertising on its buses it refused

to allow political advertising. The Supreme Court found no violation of the First Amendment. "Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician." 418 U.S. at 304 (plurality opinion). To similar effect see *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, supra,* which upheld the constitutionality of the federal statute that forbids people to deposit circulars or other messages in letterboxes without affixing postage. "[A] letterbox, once designated an 'authorized depositary' [for mail], does not at the same time undergo a transformation into a 'public forum' of some limited nature to which the First Amendment guarantees access to all comers." 453 U.S. at 128, 101 S.Ct. at 2684. But these cases actually involve a stronger argument for First Amendment protection than the present case. Buses and letterboxes are in fact vehicles for the communication of messages, and the issue was whether access to them could be restricted—access by political advertisers in *City of Shaker Heights,* or by persons unwilling to pay postage in *Council of Greenburgh Civic Ass'ns.* But the ballot in DuPage County, Illinois is in fact not a vehicle for communicating messages; it is a vehicle only for putting candidates and laws to the electorate to vote up or down. If and when advisory questions begin to show up on the ballot, we may have a different case.

In short, if Illinois allowed only binding questions to be placed on the ballot in DuPage County these plaintiffs would have no case. But in effect that is just what Illinois has done. It has made it practically impossible, at least in political subdivisions as populous as DuPage County (the only subdivision we are concerned with in this case), to put advisory questions on the ballot. Public bodies could do so with ease but they have no inclination to do so; private groups want to but the requirement of getting the signatures of 25 percent of the registered voters prevents them from doing so. Assuming public bodies never submit advisory questions, even a 100 percent requirement would thus be lawful for it would be just an oblique way of keeping all advisory questions off the ballot; and if a 25 percent requirement has the same practical effect as a 100 percent one, we do not see why the former should be treated differently in law.

This assumes that public bodies submit no advisory questions. The case would be different if they did—and particularly if, as a result, the challenged provisions of the Illinois Election Code could be viewed as a device by which the state (or county) was taking sides in the nuclear arms debate. Then the case would be like *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), where the Supreme Court held that the managers of a municipally owned theater violated the First Amendment by forbidding a particular musical play to be performed in the theater because the play was too sexy for the managers' taste—without, of course, suggesting that the municipality had a constitutional duty to operate a theater. Similarly, if the DuPage County Board had submitted a question expressing opposition to a nuclear arms freeze while the plaintiffs were laboring valiantly but hopelessly to get the necessary signatures for their question, a serious constitutional issue would be raised. But, as we have said, so far as appears on this record the County Board has never tried to put an advisory question on the ballot; nor has any other public body in DuPage.

Nor is there much danger that the 25 percent requirement might have the effect of allowing just popular viewpoints to be embodied in advisory questions, and by thus discriminating against minority viewpoints distort the marketplace of ideas; for no one can remember when any group in DuPage County gathered enough signatures to get an advisory question on the ballot. And it is clear that the challenged restrictions were not enacted in response to the nuclear arms freeze movement—perhaps in an effort to close off an avenue of

communication which that movement has found especially effective for its message—because the restrictions date back to 1901. See Ill.Laws of 1901, ch. 46, § 428. Illinois is not discriminating either directly or indirectly against the free expression of controversial ideas. It is merely not providing a novel forum for advocating ideas of any kind, and it has no constitutional obligation to provide such a forum.

■ Because we do not think Illinois has restricted these plaintiffs' freedom of speech simply by failing to make the ballot a usable means for them to communicate their views of public policy, as distinct from a means of presenting candidates and proposed laws to the electorate, we do not have to decide whether the 25 percent requirement is too high or the limit of three questions too low—if the numbers were 100 percent and zero, it would make no difference so far as the First Amendment is concerned. But we will not try to conceal our relief at not having to wrestle with such questions of degree. We can think of few issues less suitable for judges than determining the manageable length of the ballot, and whether to keep that length from being exceeded by reducing the number of candidates, the number of binding questions, or the number of advisory questions. *Cf. Lubin v. Panish,* 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974).

■ We turn now to the alleged discrimination (1) between publicly initiated and privately initiated questions, and in the latter group (2) between binding and advisory questions. These are not invidious distinctions—they are not based on forbidden criteria such as race. The test is therefore whether "any state of facts reasonably may be conceived to justify" them. *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Since public bodies are elected, directly or indirectly—the DuPage County Board directly by the people of DuPage County—their resolutions have a presumptive democratic legitimacy that a question submitted by three percent of the registered voters, which is the ap-

proximate percentage garnered by the plaintiffs' canvass, would not have. This difference is enough to show that the first challenged distinction is not arbitrary. And the preference given to binding questions reflects a judgment, which we cannot pronounce arbitrary either, that it is more important to get before the electorate questions that it can answer with legal effect than to provide another soapbox for the advocates and opponents of great causes.

Nothing in this opinion is meant to suggest that we think Illinois has necessarily made the correct choice in limiting the number of questions on the ballot to three and in making it practically impossible in the larger subdivisions to get an advisory question included. California has no such restrictions and as a result, the plaintiffs claim, California gets a higher voter turnout than Illinois. But we are not political scientists asked to draft an ideal election code for Illinois. Our only job is to decide whether Illinois has deprived these plaintiffs of their freedom of speech or their right to the equal protection of the laws. As the record compiled in the preliminary injunction proceeding below contains no evidence of such a deprivation, we conclude that the plaintiffs are unlikely to prevail in a full trial of their complaint and we therefore affirm the order of the district court denying a preliminary injunction. Our affirmance is without prejudice to the plaintiffs' presenting additional evidence in a full trial on the merits if, looking to 1984, they decide to pursue this litigation though it is now too late for them to get their question on the ballot this year.

JUDGMENT AFFIRMED.

CUDAHY, Circuit Judge, dissenting.

The majority concedes that the "25 percent [signature] requirement" presents to citizens sponsoring advisory questions a "Sisyphean task," and a "hurdle ... nearly impossible to leap, at least in DuPage County." *Ante* at 299. This concession notwithstanding, the majority concludes that, since plaintiffs have no fundamental right to put advisory questions on the bal-

lot, the state—having ostensibly granted such a right[1]—is free to make it wholly illusory. This conclusion defies common sense. A state cannot simultaneously provide an avenue of political expression and burden its use with conditions that, as the majority concedes, can never be met.

In fact, the district court (which agreed that there was no fundamental first amendment right to place advisory questions on the ballot) properly struck down the 25 percent signature requirement as patently excessive. The district court erred, however, in denying plaintiffs any relief since it went on to find that the three question limit *validly* precluded them from the ballot. But this limit, even if valid in some different context, cannot fairly be applied to these plaintiffs who no doubt delayed submitting their petitions until the deadline, August 16, 1982, in the hope of somehow meeting the grossly excessive 25 percent signature requirement.

Further, I believe that the three question limit, combined with the first-come-first-served principle and the fact that local governing bodies can put questions on the ballot with a simple resolution,[2] makes it both possible and likely that the County Board will preempt the ballot spaces at its whim. And the Board can render the rights of private citizens who have obtained sufficient signatures, especially those citizens who espouse controversial causes, quite meaningless. For example, in 1980, the County Board met one day prior to the filing deadline for ballot questions and approved, in a span of about fifteen minutes, eleven questions for the November 1980 ballot. The next day, when citizen groups brought in five petitions (with sufficient signatures[3]) proposing ballot questions on property tax reductions, they learned that the three available spaces had already been taken by the Board.

1. ILL.REV.STAT. ch. 46 § 28–6.

2. ILL.REV.STAT. ch. 46 § 28–1.

3. These petitions were submitted pursuant to ILL.REV.STAT. ch. 120, § 643(a), which permits binding public questions concerning tax rates, to be printed on the ballot if submitted by

Finally, I know of no authority for the proposition that questions initiated by the County Board are somehow presumed to be better endowed with "democratic legitimacy" than those springing directly from the people. It seems to me that the relative degrees of "democratic legitimacy" of the questions can only be guessed from the turnout on election day—if, of course, the citizens' propositions ever make it to the ballot. Therefore, in view of the Supreme Court's concern that systems regulating access to forums for first amendment expression have adequate safeguards, *Southeastern Promotion, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), the three question limit as presently applied must also be invalidated.

The legislative scheme presented here distinguishes among three groups: citizens sponsoring advisory questions, citizens sponsoring binding questions, and local governing bodies who may sponsor both advisory and binding questions. The state has distinguished among these groups in the way in which they can get their questions on the ballot. At a minimum, we must consider whether "the varying treatment ... is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979).

The district court found that the 25 percent rule excessively burdens "the very right which the legislature has created." 546 F.Supp. 469, 477. Indeed, the majority admits that the requirement has the "practical effect" of "keeping all [citizen-sponsored] advisory questions off the ballot ...." *Ante* at 301.[4] Thus, the 25 percent

citizen petitions bearing 1,000 or more signatures.

4. In the analogous area of candidate access to the ballot, the Supreme Court has stressed the importance of realistically appraising the effect of ballot access rules: "the inevitable question for judgment [is]: in the context of [a state's] politics, could a reasonably diligent indepen-

rule if upheld, serves to deny the very access to the advisory question system that the statute simultaneously purports to grant.

The state argues that the 25 percent rule is a reasonable means of ensuring that citizen-sponsored advisory questions hold sufficient interest for the community. Brief of Intervening Appellee at 42. In other words, the objective of the 25 percent rule is to maintain the integrity of the advisory question system lest it become cluttered by "interest groups espousing issues ranging from the sublime to the ridiculous, all clamouring for a place on the ballot and their day in the public limelight." *Id.*

Though the state's objective is legitimate, it has chosen wholly irrational means to achieve it. In the name of preserving the advisory question system, the state "keep[s] *all* [citizen sponsored] advisory questions off the ballot." *Ante* at 301 (emphasis supplied). This circuit recently rejected an Illinois election statute (employing similar overkill) as an irrational means to a legitimate end. In *Richards v. Lavelle,* 620 F.2d 144 (7th Cir. 1980) (per curiam), a candidate and his supporters challenged an attempt by the Election Commission to deny the candidate a place on the ballot because he submitted *more* signatures on his nominating petition than the maximum permitted by Illinois law. The court accepted the validity of a limit on signatures, but it found the means of enforcing the limit—removal—unconstitutional: "the method chosen . . . does not serve in any rational way the administrative efficiency interest which the state legitimately asserts . . . ." *Id.* at 149. Rational responses to the problem could have included such actions as returning the excess petitions or refusing to consider any signatures beyond the statutory maximum. *Id.* at 148. Similarly, the

state here has chosen an irrational means, effective preclusion of all citizen-sponsored advisory questions, to a legitimate end, maintenance of an orderly advisory question system for the benefit of citizens and local governing boards who wish to sponsor advisory questions.

The majority attempts to impose rationality on the 25 percent rule by seeing it not as an attempt to maintain an orderly ballot, but rather as in effect "an oblique way of keeping all advisory questions off the ballot." *Ante* at 301. In other words, we are to believe that the state, though it expressly stated otherwise,[5] never intended to grant citizens any access to the advisory question system and that the 25 percent rule was a rational means of effecting this denial. In order to accept this remarkable proposition, we must ignore, at the very least, the canon of statutory interpretation that a statute should be interpreted so as to give effect to all its provisions. This is so because the majority's interpretation of the 25 percent rule renders meaningless § 28–6, which states that citizen groups shall indeed have access to the ballot for advisory questions.

More importantly, even if this were the legislature's intent in adopting the 25 percent rule, we should be loath to sanction such a tactic. By appearing to grant a benefit with the one hand while covertly withdrawing it with the other, the legislature easily circumvents "those political processes which can ordinarily be expected to bring about repeal of undesirable legislation." *United States v. Carolene Products Co.,* 304 U.S. 144, 152–53 at n.4, 58 S.Ct. 778, 783–784 at n.4, 82 L.Ed. 1234 (1938).[6] Though the government may not be required "to create a well informed citizenry," *ante* at 300, surely we cannot approve a statutory technique the disingenuousness

---

dent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" *Storer v. Brown,* 415 U.S. 724, 742, 94 S.Ct. 1274, 1285, 39 L.Ed.2d 714 (1974).

**5.** Ill.Rev.Stat. ch. 46 § 28–6.

**6.** *Cf.* P. Bator, *et al.,* Hart and Wechsler's The Federal Courts And The Federal System 358 (2d ed. 1973) ("If Congress wants to frustrate the judicial check, our constitutional tradition requires that it be made to say so unmistakably, so that the people will understand and the political check can operate.")

of which, as described by the majority, combines an apparent opportunity to speak with a real commitment to silence. The state has furnished a "soap box" fashioned of papier-mache.

Having correctly rejected the 25 percent rule, the district court erred in concluding that appellants were nevertheless properly precluded from the ballot by the three question rule. But, we cannot fairly apply the three question rule to these appellants, even assuming the rule is independently valid, because we cannot know at this juncture whether appellants could have obtained enough signatures to meet a *reasonable* minimum requirement in *advance* of the DuPage County Board meeting of July 20, 1982, at which time the last ballot slots were taken by the Board. Being thus ignorant, we should order the inclusion of appellants' advisory question on the November 1982 ballot but allow the state to adopt for subsequent elections a signature requirement rationally related to the objective of preserving ballot order.

In any event, the three question limit is not independently valid. The three question rule, in conjunction with the first-come-first-served principle and the ease with which local governing boards can propose referenda, virtually invites local boards to preempt citizen-sponsored questions. The state cannot enforce a rule that has the effect of inviting undetectable and unreviewable censorship by units of government.

Though a state need not expand its electoral process to include citizen-sponsored binding or advisory questions, once having done so, it cannot attempt to avoid compliance with first amendment strictures. In particular, when a state chooses to sponsor a forum for the expression of ideas, it must take care to provide adequate procedural safeguards against unconstitutional censorship. For example, in *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), a theatrical production promoter sued the directors of a municipal theater who had refused to permit the staging of the musical "Hair." The Court held that the directors' power to grant access to the theater on the basis of their review of a play's content enabled them to exercise a prior restraint of protected expression. The Court then held that the prior restraint was unconstitutional because it lacked necessary procedural safeguards. The Court stated, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Id.* at 553, 95 S.Ct. at 1244.

In this case, although the Board would not claim authority to preempt citizen petitions that it deems unsound, the procedures themselves clearly give the Board just such power. Moreover, there would be no way of knowing when this power was being exercised given the difficulty of determining the Board's motives in, for example, putting forth eleven of its own ballot questions just in time to keep all citizens' questions regarding tax reductions off the ballot, as it did in 1980. Access to a forum for the expression of political speech cannot be left unprotected from undetectable and unreviewable government censorship. Therefore, I would also reject the three question limit as it is presently enforced.[7]

For these reasons, I respectfully dissent.

---

7. Illinois could readily serve its interests in ballot order, citizen access, and governmental access by imposing, for example, a four question limit and allocating two questions to local governing bodies and two questions to citizens.